The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, Mr. Gross, you may proceed. Thank you, Chief Justice Gregory, and may it please the Court. The lay witness evidence presented at the PCR hearing establishes ineffective assistance of counsel under both prongs of Strickland. Regarding the performance prong of Strickland, trial counsel failed to interview and call available lay witnesses that would have provided detailed and specific evidence about Mikal Mahdi's childhood. Trial counsel did not interview the majority of the lay witnesses that testified at the PCR hearing, and the ones they did interview, they did not interview competently. Thus, the PCR judge and the district court unreasonably found and concluded that trial counsel conducted a reasonable mitigation investigation. Regarding the prejudice prong, the PCR judge and the district court unreasonably found and concluded that the lay witness testimony was cumulative to Marjorie Hammock's 24-page sentencing hearing testimony. Of that 24 pages, 8 pages, or one-third of the testimony, was devoted to explaining her expert qualifications and the methods that she used. The lay witness testimony presented at the PCR hearing would have precluded and changed the trial judge's findings of fact regarding Mikal Mahdi's character that are set forth in the sentencing order. Significantly, the sentencing order is void and omits any information or factual findings regarding Mikal Mahdi's childhood before the age of 15. PCR evidence detailed Mikal Mahdi's, or detailed the violence that Mikal Mahdi inflicted on Mikal's mother, Vera, that he and his brother were forced to watch, resulting in Vera having to flee the household in order to protect her safety. When she wanted to take Mikal and his brother with her, Sharif threatened to kill both of them. Then, there was the lies that Sharif told. Despite Vera running to flee Sharif's violence, Sharif told Mikal and his brother that she didn't love them. He also lied and told them that she was dead. The evidence presented at the PCR hearing through the lay witnesses also established Sharif Mahdi's utter lack of parenting skills and inability to provide for Mikal's basic needs, leading Mikal to have to fend for himself on some occasions. The lay testimony, particularly the teachers, presented and charted the depths of the educational neglect that Sharif had towards Mikal. Early in Mikal's life, there was a large gap in his attendance. When Mikal moved to live with his aunt and uncle in Baltimore, he wasn't able to read despite having the intellect to be able to do so at that age. The lay testimony, particularly the teachers, also uncovered the depth of Mikal's childhood depression. When he was in the second grade, he said, why doesn't somebody just shoot me? If I had a gun, I would shoot myself. And then there was a complete failure of the family to provide Mikal with a psychiatric treatment that was recommended by the school officials. Between the second and third grade, Mikal learned about the lie that his father Sharif had told him and learned that his mother was, in fact, alive. But the reunification went horribly wrong. Mikal watched his father beat his mother, and she had to run into the woods, and then he witnessed his father beat his grandmother, Nancy Burwell, by tying her to a tree and whipping her bare legs. That was what Mikal witnessed between the second and the third grade. When he returned to the third grade, his teacher said he was withdrawn, which is not surprising after the traumatic summer that he just endured. Myra Harris, the teacher, watched Mikal to begin to thrive in her classroom when he had the structure that she was able to provide, and also when he was away from the toxic environment provided by Sharif, because at this point, Mikal was still living in Baltimore. But even Baltimore wasn't a happy place and a successful place for Mikal. We already talked about him not getting the psychiatric care that was recommended following the second grade. There's also the 10- to 15-minute beating that his aunt Lawanda inflicted upon him that led Mikal to ask for the police officer to give him his gun so that Mikal could shoot himself. You're in the subsequent- Social worker testified to or included in her written reports that was inaccurate? Well, it depends upon what you mean by inaccurate. I mean, the trial judge in his sentencing order was allowed to conclude that Mikal- Well, what I mean, is there anything that she testified to or put in her written reports that was not factually correct? Well, her written report painted a picture of a child who had supportive parents and didn't witness violence, didn't experience violence in his lifetime. Her report painted a picture that allowed the trial judge to find that Mikal was responsible for the standoff, the nine-hour standoff, that when Sharif Woodley was finally interviewed and asked the question, testified that it was Sharif that was the architect of that standoff. And so, the question is, is whether or not Marjorie Hammack painted an accurate picture for the jurors, well, I'm sorry, for the trial judge in sentencing. That report is very conclusory, very summary, well, it's not even a report, it's just 15 pages of testimony and two pages of an exhibit that provided none of this detailed and specific information about Mikal Mahdi's childhood, and significantly, the judge's findings in sentencing would have been different if this evidence had been presented. The judge could not have found, as he did, about Mikal's role in the standoff because of what Sharif Woodley testified to, the particularly harsh, extremely harsh finding that the trial judge made, that he could not find any signs of humanity in Mikal Mahdi is refuted by the testimony of the teachers. And I think of the fifth grade teacher who recognized not only that Mikal was withdrawn, but that he had potential. She had to have Mikal sit next to him so that he could do his schoolwork and he could draw, and she witnessed the sadness, the very deep sadness and the depression, but yet she said he had, at that point in his life, the ability to succeed and even do well in the world. She also witnessed firsthand the brunt of Sharif and how he thwarted and prevented her efforts as a special education teacher to bring Mikal into a thriving environment. Mikal's father, Sharif, went to the first counseling session and got disruptive and was angry and blamed the psychiatrist or the psychologist for writing a negative report. And this was evidence, a glimpse into the anger and the hatred and the racial animosity that Mikal's father was drilling into him. This ultimately led to Sharif pulling Mikal out of school and suffocating and choking the life out of his humanity with the supposed homeschooling. I have nothing against homeschooling, but this wasn't homeschooling. This was Mikal's father, Sharif, going on rants about politics and religion and his racial hatred for white people. It involved Mikal's father teaching Mikal and Sharif violence and survival skills and taught them how to use a knife to stab people and guns to kill people. If this evidence had been presented to Judge Newman, Judge Newman would not have been able to make that finding in his sentencing order that there was nothing about Mikal's life and childhood that explained what happened in the crimes. And the answer to Judge Agee's question is yes, there are things that are inaccurate and that's what you're explaining now, correct? That's absolutely correct, Chief Judge Gregory. And also, I guess your point is that the reason why the judge, understandably so, could say that he saw no humanity because the only thing that was left with him was the horrible crimes he committed that he was sentenced for. So, he had nothing left to judge about the boy inside of the man or the child who was never developed. That's, I'm sorry. Is that right? That's absolutely right, Judge Gregory. And it goes back to the point that I made earlier that the judge's sentencing order begins at age 14 when Mikal's incarcerations in juvenile institutions begin. It begins after Mikal has gone through all of this childhood trauma, witnessing the violence, experienced the violence himself, being yanked out of school and being indoctrinated into this type of, you know, hatred and militant kind of lifestyle. I mean, this is a child who never had a chance from the day he was born. And by the time he was 14 and in juvenile institutions, he was already a severely broken person. And there is a direct line from this violence and neglect perpetrated by Sharif and Mahdi's early childhood that runs to him going to the institutions. And then when he comes out of the institutions, totally lacking the skills to survive in society. And it was unfortunately, sadly, tragically, you know, these skills that were taught by his father about survival and militant and violence. And can I ask just a framework question? You've compared the lay witnesses to Ms. Hammack's 15 pages of testimony. And I'm just asking sort of more generally, don't we have to compare the— because it's a fair to investigate claim, not a fair to present claim. Well, it's both. Right. And you can't present it if you don't investigate and— But let me finish and then you can answer it. You can tell me if my premise is wrong, but let me finish the question first, right? So you compared to Ms. Hammack, but don't we have to— shouldn't we compare the new evidence, what you described as this new evidence from the lay witnesses against all the information that was known, you know, from the mitigation investigator, from the psychiatrist, you know, the social work, you know, all of the private investigator, all of that known information, not just what was presented in Ms. Hammack's testimony. Don't we have to compare to whether it's repetitive of the information that they did develop, not just what they chose to present? Well, I think there's several parts to your question. And, you know, one is it can be ineffective assistance of counsel alone to have the information and not have a strategic decision not to present it. And so where—so that's a good point. What—where do I look in the habeas petition to find that claim? Well, the claim is that they failed to investigate and present evidence for mitigation. And encompassed in all of that is it's really the state, the government that has to try to excuse the failure for a strategic reason. No, no, no, no, because—so this is—this is important to me. And I think you've got an argument either way. I just want to understand the framework, right? Because you're saying it's—we're comparing the seven to Ms. Hammack. Right. And you say, well, yes, there is this other information that was not presented. You know, Ms.—I think it's Ms. Munn. I may have her name wrong. Did—you know, got school records, taught the school officials, did this, you know, background mitigation investigation, right, and got this information. Not all of that was presented to the trial court, but the lawyers had it. Well, and the lawyers didn't even present it all to Ms. Hammack because her testimony talks about reading summaries of some of it. But the testimony is that the teachers were— I understand that. But what I'm trying to—what I'm trying to understand is, don't we have to look at whether these seven new witnesses that you've identified, whether they are cumulative of the information that had been developed in total, not just what was presented, but what all of the information that Ms. Munn actually had, because that's the scope of the investigation that was done, right? And if it's a fair to investigate claim, we have to compare the new information against what was investigated, no? Help me understand why I'm wrong about that. Well, they didn't interview—I see my time's up. Can I— You may answer, yes. Yeah, there's no evidence in the record that they interviewed the teachers. And, in fact, the evidence in the record is that they didn't interview the teachers. The evidence in the record is that they didn't interview Sheriff Woodley. And— They did interview school officials, and they did obtain school records. Well, but— But yet, they didn't interview these teachers. I understand that. But what I'm saying is, they did get—at least the record seems to suggest that they interviewed school officials and obtained school records, Ms. Munn. Right. Any competent mitigation investigation involves going out and looking for as many teachers as you can find that knew the person when he was as a child, and there was no effort to interview these teachers and learn the powerful mitigation stories that they were able to talk about a child who was still, you know, full of humanity and hope and potential in life. And this is not cumulative to either the testimony or the initial investigation. And part of the response to Judge Richardson's question, it's also clearly a fade to investigate. You also have to show also that what was there to investigate and what impact it would be. So what you're—I think your argument there is coming in parcel with the whole idea of what the gravity of this unbelievable testimony. Someone would leave to an investigator to, you know, a 20-page or so. I mean, it's just so much things developed. For example, they had to investigate. There's a body of work about children who are children warriors in countries where eight- and seven- and eight-year-old kids are armed and in conflict and the incredible trauma involved in trying to repopulate those children after the hostilities. It's just unbelievable. In a death case, you plead guilty to a judge. The whole thing is to explain the whole profile of the person. So it's hard to separate. I know exactly—I understand Judge Richardson's question, but the whole part and parcel is you can't just put a drought report in it. You've got incredible trauma. This kid in fourth grade snatched from school, couldn't read until he was eight, and then he started making progress. That's what the teachers would show. They weren't interviewed. It's an incredible story, story meaning in terms of the journey, not tale, but a story of a child who didn't have a chance to be a child. Now he stands condemned as a man, and what you're left with, what happens? A person left in the dark will sin. Who's responsible? The one who sins or the one who creates the darkness? He presents nothing in terms of the darkness at all, just the sin. And to give the judge a full range, that's what this case is about. Go ahead. I'll let you go ahead. You're a little over your time, but anything you want to conclude with? Judge Gregory, I think it's absolutely right. And as the Supreme Court has said in context of juvenile cases, the child has no choice and no ability to remove them from the situation that the parents and the family create for them. And this just is tragic. And you make a good point that the judge didn't have any information to make different findings that he did. And because that information that undermines those findings exist, you know, the PCR court both was unreasonable in its interpretation of both the facts and the law. And this is why Mikhail Mahdi should have a new sentencing hearing. All right. Thank you, Ms. Brown. Thank you, Your Honor. May it please the court. I just want to pick up on the conversation that we're having this morning because what stands out to me is we're missing a step. We're talking about trial, but we're not talking about PCR. We're talking about trial investigation, slightly, mostly presentation, but not about PCR investigation. And I think we need to back up here because this is not just another collateral action. This is not an opportunity to go in a different direction. Habeas is supposed to address extreme malfunctions in the system. And we're here today because of choices, the choice that Mr. Mahdi made to be sentenced before Judge Newman, the choices that PCR counsel made based on a very intense investigation, and what they decided not to exhaust, properly exhaust, not to take up to the state Supreme Court in the PCR appeal. There are a lot of choices here that inform this particular conversation, and we're talking this morning about what could have been done differently in presentation. But what could have been done differently, or a few witnesses here or there that are different, does not make trial counsel unreasonable either in investigation or presentation. And it does not, if something could fit under Martinez, does not make PCR counsel ineffective. I think going back just a little bit and looking at the investigation itself puts things in a bit of context. For trial, the mitigation investigator shared at post-conviction relief that she put in over 170 hours investigating, anticipated 75 hours more. She traveled to Virginia. She traveled to Pennsylvania. She traveled to Baltimore. She interviewed families. She spoke with the North Carolina team because, as you'll recall, Mr. Mahdi was on a crime spree down the coast and killed a store clerk in North Carolina before killing Captain Myers in South Carolina. And the attorneys in post-conviction relief also said that they had traveled to North Carolina. They had spoken to the defense team up there. In fact, they had gotten a continuance to be better able to go over what the North Carolina team had in addition to all of these hours and hours and interviews that their mitigation investigator had. Now, on top of that, even though they were trying, they told us there were limitations because at the time, they were talking to Mr. Mahdi's grandmother. He wanted to talk about the accomplishments of other family members. Now, what that would have done, as was explained in post-conviction relief, was to show that you had family members who were doing very well, the brother in the Army doing very well, other family members who had gone to Ivy League schools. And let's keep in mind, Mr. Mahdi was testing at over 100 IQ. I think the last test was 118 IQ. He's competent. And there was no expression for this murder other than to take a car, to take weapons. So when we talk about trying to tie all of this investigation to the context of the crime, what we see in the end result is that by the age of 21, Mr. Mahdi had committed multiple murders. And his motive, express motive, was murder. Ms. Brown, I mean, you can argue the case the way you want, but I guess we are here in terms of answering the court's questions. You make a great argument about whether or not there was evidence that may have justified the sentence of death and that he did something horrible. The question here is whether or not there are things that were left out that the court needed and should have been, competent counsel would have had before the court. Certainly, I don't think you don't have to be convinced about it, that the crimes were horrible, that he did horrible things, clearly. The question is, and I think the judge put it quite clearly, and what you talk about is the other members doing well. Oh, my goodness. A good lawyer, a trial lawyer, you take that, that punctuates, that punctuates the trauma and the difference of what could have been, that he was not born in terms of God-given ability, but man's intervention in the horrible beatings that he had. That's the question. Yeah, you can spin it, and you would as a prosecutor, but that's what defense lawyers do, give it a different framework. So everything you're saying, I mean, that's really not, is of no moment. You don't have to convince him about it, what he did was horrible. It's horrible, absolutely horrible. Well, Your Honor, I think- The question is, tell me, I mean, in terms of filing a case, I mean, I've tried a lot of criminal defense cases, and I mean, to have this kind of record, you would leave it to somebody else and not these teachers to look at, you know, whether or not you talk to the teachers. I mean, you talk about she spent so many hours, so what? Hours alone does not translate into truth. No effectiveness, a lot alone. Now, you can go ahead and argue in one, but I just don't see how that's relevant to what before you skipped the PCR. Well, that made a lot of those things, I think, excuse default, and the Martinez claim, too, a lot of aspects of it. But it really does start with what was just totally bereft. Well, Your Honor, I would respectfully disagree, because what we're talking about is the character of the man. We can't just focus on what we believe would be sympathetic. We have to show- Yes, we do. We do. At this point, we do, because I agree with you, there's plenty of evidence there that would justify the sentence, perhaps, that he received. Clearly, we're not ignoring that, but the point is, it has to be a balance. The law requires it. That's why you have the Sixth Amendment right to counsel. My goodness, he pled guilty to the judge. I mean, so the other side of the thing is to, what do you do to explain the person? You say we only have a man to judge. That is the narrow thing that was left to the court. But believe me, things that happen in your childhood form the basis. I think any psychologist will tell you that. Anyway, in terms of trauma and childhood, you just don't wake up and go from depression and cheer up. That trauma, it stays with you. And that's who was before the court, but the court never had a chance. The court said it so well. I don't see anything that referenced humanity. And with this record, how this case was defended, I can understand that. So, I mean, again, I just don't see you addressing the question here before, and that is, if you don't put anything up there, that's all you have left. But that was available to investigate, to talk to these teachers. For example, you snatched a boy out of school. Did you investigate whether or not he may, when you homeschool someone, it's not just homeschooling somebody. You have to make reports. It's work. It's hard in this school. Did you investigate whether or not there were any records? The only thing you show is those kind of things. That's important. Don't you agree that's important, counsel? I know you represent the state, but justice requires something higher than just to hear the day. Don't you agree that that would be important, if you had a client like that? I agree. In terms of that kind of history? I agree that justice requires balance, Your Honor, and that means taking the good and the bad. Where's the balance on the other side? You're just going totally on. So you think that, are you saying, is your argument this, that even if the judge knew everything about his childhood, the abuses and all those things, you're saying that there's just no way that could have made a difference? Is that what you're saying? That's your argument? I don't think it's a reasonable probability it would have made a difference, based on the fact that he was given evidence of the trauma that Ms. Hammack testified, but, again, we're missing that step for the post-conviction relief investigation, and I would like to point the court, particularly, to Dr. Cooper Luter, who testified as the clinical social worker in the post-conviction relief action, and he incorporated even more themes into his particular presentation. For instance, Joint Appendix 2389, he testifies that he goes into focus in a multi-generational legacy of grief, trauma, resilience, risk. These are the factors Your Honor had mentioned, and he goes into that. He's investigated, he's synthesized the materials, and he's presenting that, and in that report that he issued for the PCR, and this is Joint Appendix 2955, he goes into, quote, bitter resentments about unfair issues of race. At 2956, he notes that Mr. Motti was lectured religiously and passionately about the unfairness of white people. 2958, he points out cultural and racial relations, and in his own testimony in post-conviction relief, he looked at the story of Motti's life and influences. So all of this was laid bare, and what we found is that there was a lot of bad coming in with a little bit of the good. Now, does that mean you can't present the good? Obviously not. There was trauma presented in the trial itself, and keep in mind not to judge. Counsel, can I ask maybe a factual question? I was talking with your colleague a minute ago about Ms. Munn, and I believe you referenced her discussions with school officials and school records. Were there others in the investigation, the psychologist, psychiatrist, the social worker, whoever it was during the trial investigation, not the PCR, who also looked at school records or talked to school officials, or was that primarily Ms. Munn? It's just a factual question. It's a big record. I've tried to get through it. I believe that the defense team worked in tandem, so if those records were obtained, I think they were also given to other defense team members, and that would have included Ms. Hammett, that would have included the two psychiatrists, psychologists that they had for the trial as well that they did not use because there was nothing there that was helpful. Do you remember, this is not a memory test, but which were the two that they used at trial? Which of the two psychiatrists, psychologists that were at trial? They didn't use them at trial. No, but they were investigated at trial. I understand. That was Dr. McKee and I believe Dr. Martin. I believe those were the two, and they just did not have something that counsel thought would be beneficial to present, and what they came to the conclusion of was antisocial personality disorder, which goes back to the character of the man. That's not helpful before either a judge or jury, so they were not presented. Counsel, I have kind of a related factual question. There was a fair amount of evidence, and I simply don't remember whether this was at trial, PCR, or both about the interviews with Mr. Motti's family members, which apparently were fairly extensive, and if I'm recalling either the testimony of trial counsel, psychiatrists, psychologists, there was a conclusion from those interviews that the aggravating evidence that those family members would have brought in to the proceeding far outweighed any mitigating effect. Is that accurate, and at what level was that decision made? Yes, sir, that is accurate, and the decision not to call some of the family members was made for sentencing, and at that time, there were certain family members who did not cooperate, and that testimony came out in the PCR at 2837 and 2894 to 95, and also some of the individuals who did testify at PCR in support that they would have come down were actually those people that gave information that counsel did not want to use. For instance, one uncle that Mr. Motti went to live with actually termed Mr. Motti a demon, and that he did not want that kind of information in there, and he expressed he didn't want to come down. That changed, and that's not unusual in these cases, or time to pass, and family members change their minds of what they want to say or how they want to say it, and sometimes it's a bit of revisionist history in there, but that is sometimes just the effect of time, but that doesn't mean that it affects the reasonableness of counsel. Counsel made the decision based on the information that they had, and it's a reasonable strategic decision not to go in that direction when people are not cooperating. Counsel, what about the rejection of the request for funding for the race-based trauma expert? Yes, sir, abusive discretion standard, and the abusive discretion argument that Mr. Motti puts forward is that there was an incorrect legal structure used, and he's relying on a yes desk, and one of the biggest problems he has with that argument, Your Honor, is that a yes desk did not change the statute. The statute, 3599, still is reasonably necessary services, and that's what one has to find, and that's what the district court relied on. That's in the district court order in the joint appendix at 3738. You mean a court's decision on what that statutory meaning should be applied has nothing to do with the statute now after that case? Is that what you just said? It did not change the statute, Your Honor. It's still reasonable. It doesn't have to change the statute. It tells about it's a jurisprudential opining on how it should be read in terms of as a standard. It is not an absolute necessity. It certainly did change it in terms of how our court has to look at that. It certainly does. It doesn't change the statute's words, but that's what we do. We interpret statutes, right? And the court said that it was too harsh. It was too rigid in death cases. Am I wrong about that? It seems like you're using the right standard. It's not quite that clear, Your Honor, because there was a test that caused a court to look at whether something was substantial, and the Supreme Court looked at that and said, there may be a bit of a difference. It's arguably a bit higher to say substantially needed over reasonably necessary, but that's not the tipping point. The tipping point was, and the court was very clear about this, that you can't say because it's procedurally defaulted that can't be reasonably necessary to investigate another line of information. That was the tipping point. That was not done here. The claim was not prejudged, and there was no consideration of the procedural default at that point. This was merely investigation. And a yes case can't apply because he was given money twice. This is the third request that was denied, Your Honor, for the same vein, for the same type of mitigation evidence. And what was being requested was basically a person to create another theme for the presentation of the information that was already obtained. And that is to- You know, you come here and you argue like, you know, you know both sides of the case well. You know your case. You know the defense case. You're telling us now you know exactly what an expert would do. I mean, my goodness, having the way you argue the cases, all we have to do is just listen to you and then just decide the case based on that. Because you tell everything now that, well, that would have only just- But that's where the whole idea is. The man is on trial for his life. You know, the state wants to kill him. And you're talking about funding for a very important part of this person's childhood. It's childhood. And in many cases they talk about children are different. And you can't expect a child to go through this and come up with a different type of person as a man without giving a full consideration. But everything that comes up, you just flip it and say, well, it's just the same type of thing. It would be done. How do you know that? You don't know that. I don't know that. That's why the question is why wasn't there a chance of funding it? You know, I know you're a very smart lawyer, but I don't think that you know everything about what an expert might find when they look at the records. I certainly don't know. And a person's life is on the balance here. It's not just a matter of just flipping it and saying it wouldn't have made a difference. Courts seem like they were bereft of anything. You talk about, you know, my goodness, in a case where nobody in their family was put on? No one? I mean, my goodness, you say, my goodness, that no one cares whether or not this person lives or dies? And everything a person says to you in terms of the family member, you might start with, and that's what good lawyers do. You hear everybody out what they say, and then somehow you, you try to get to the point where you can find some distilled evidence that's important. So we don't, we don't know. I mean, but I just thought it interesting how you just sort of casually say, well, it doesn't make any difference with funding. But is that the standard? That's not the standard. It doesn't have to show to be prevailing. And that's important. It will make the case stronger. When you come here and have these incredible, and the courts have said that, and death is different. It's different. But go ahead. Your time is up. But if you want to make some concluding, closing, you may, you certainly may. Thank you, Your Honor. I appreciate that. I think that courts are asked many times to consider whether something is going to meet a certain standard. And while none of us may know a hundred percent on what a jury, a juror, or a judge may find important. We do know that there is structure to the judicial system. And we do know that habeas is not just a forum to create another theme. And, Your Honor, that's what I rely on. The state of South Carolina allowed Mr. Motti funding and well-qualified post-conviction relief counsel, people who had experience, over 30 cases for one lawyer, 15 capital cases for another, investigative tools, money, time, presentation. That's, Your Honor, why we can say the funding is duplicative at this time, even after it was given in large part by the district court. But I thank Your Honor for allowing me the time to explain that. And unless there are any other questions, I'll conclude. Thank you so much, Ms. Brown. Thank you. Mr. Gross, you have some time reserved. Thank you, Chief Judge Gregory. The government talked about claims, PCR claims that were not presented to the state court, Supreme Court. And, Chief Judge, you mentioned Martinez. But I want to note for the record that every single factual account that I told in the first part of my argument was matter that was presented through lay witnesses at the PCR hearing and is part of the claim, the habeas claim that everyone agrees is not defaulted. And that's whether or not lay witness testimony would have changed the outcome of the sentencing hearing. And even when I talk about Mikhail Mati's deep depression in my opening argument, I wasn't talking about anything a psychiatrist or psychologist or social worker said. I talked about what teachers observed when they looked into Mikhail Mati's eyes, what people heard when they said, when Mikhail Mati said that he wanted to have a gun from a police officer to kill himself, that when Mikhail Mati was asked, what is your one wish in life? For my family to be reunited. And when that person, probably realizing that that was not realistic, asked him, what would your second wish be? To kill myself, to jump off a bridge, to shoot myself, or to use my bow and arrows to kill myself. And while I'm a heart of hearts, I would like for this court to find a path to consider some of the materials that were not presented, some of the claims that were not presented to the South Carolina Supreme Court. Even if you don't find that path, the testimony that was presented by these capable PCR lawyers who actually did talk to and listen to these lay witnesses is more than enough to establish both the deficient performance and the prejudice prong of Strickland. The PCR judge's order. Counsel, let me ask you, I want to go back to our discussion in your opening presentation when we were talking about Ms. Hammack. And I went back and looked at her testimony. And she told the sentencing judge that Mr. Mati has been traumatized throughout his entire life and that he's had an impact on his inability to make good choices, to have a good sense of himself, and to behave according to societal norms. He's a young man who's been abused and neglected. He suffers from abandonment. He's never been exposed to the right kind of socialization. He has poor self-esteem. He has a poor history of school progress, a poor sense of self. He was neglected. He was abandoned. He suffered from poor parenting and was likely to end up in a situation where he's out of control and it does damage to himself and others. He never really had a chance to develop. Is any of that inaccurate? I think that's accurate, Judge, but those are only conclusions. You know, part of the claim that was presented to the state Supreme Court was that the actual facts that are underlying that was not investigated and presented and that those stories are engineered into our DNA. They have effects on people who are listening to the stories. The factual information to support those conclusions was not there. I also look back at Ms. Hammock's testimony while the state was arguing, and it was a very narrow list of witnesses that she interviewed. And on page 1596 of the joint appendix, she said that all she had was, this is at line seven, I reviewed a synopsis of his school records and reviewed a report from his mental health in voluntary, it should be involuntary admission in Virginia. And then she says in Baltimore. So, you know, trial counsel gave her very few tools to do anything with that. Yeah, this is exactly what I referenced. All these people supposedly, the report doesn't, it's interesting. But anyway, but for example, I'm glad Judge Agee asked a good question to follow up on that in terms of where he lists those things he read, matter of fact, verbatim. And it shows the problem in this case. That yes, it may be true that that equals, as you say, a conclusion trauma, but to say it's trauma and not explain what it is at all. I mean, trauma could be, I mean, it ranges from, well, you know, you went to bed and couldn't play with toys at McDonald's or whatever. I mean, not McDonald's, but I mean, like fast food or whatever, you didn't, that was trauma. No, no, no. You can't say, in other words, social school progress. That didn't get anywhere near to explain being taken out of school when you're in fourth grade. And I don't know any investigation about that was in its follow-up at all in terms of did the parent report any progress at all. To just call that school progress is just putting a label on something. As we all know, we say it all the time, all council did was just have these conclusionary arguments, but nothing there. You need something there. And it's not enough to just tick off the number of hours you spent. You're right. You look at it very narrow. That's what people actually talk to. And who, for example, did you get the information from about when he was waiting, anticipating that his mother would be, you know, reunion, then what you account for the record shows, at least that was presented about his mother, the situation with that reunion. Where did that come from? I think that came from family members' lay witness testimony. Right, lay witness testimony. Right. And just to say, oh, I talked to the whole family and nothing else, nothing was redeemable from that. That's the lies from the record. I mean, the only way to believe that almost stuff is not to read it. But go ahead. I would just pick up on that real quick. I thought the store, I just want to make sure I understand. And so if you could just give me slightly more from the reunion story, I understood that that was information developed during the mitigation investigation from family witnesses. You said it was also new evidence from the lay witnesses. They also talked about it. Which lay witness talked about that reunion? I believe that it was, you know, some of the aunts that testified. And I know the district court looked at the claim that was presented to the state Supreme Court very narrowly. But the family member lay witness testimony was also presented as part of the background to the state Supreme Court. So just so I'm clear, I just want to be able to go find it in the record. This is a heavy record to go through, but I'm just asking for a little help. Did any of the seven lay witnesses that we've mainly been talking about today, did any of those seven talk about the reunion with the mother? Well, I think that came from the aunts that testified at the hearing. And that that was part of the family background that was presented to the PCR judge and presented as background to the state Supreme Court in the direct appeal. Right. So those were the witnesses that Ms. Munn had talked to before the trial. But that information was not presented. I wasn't trying to, this is not a critique. I'm just literally trying to understand where the information is coming from. That's all. And how do you know she had that information? You got to understand what the question with Judge Richardson is asking you. He's trying to, he was asking you, was it known and investigated? Making that the first, very careful in terms of the questions asked of you. Was it investigated versus whether or not it was available? And was it used? So the question is, is it in the record that she had that information? I don't think there's anything in the record that she had. I don't think so either. You have to be very careful when you're asking questions, counsel. Yes, sir. And I think that I did acknowledge at the beginning that some of the witnesses that testified at the PCR hearing were interviewed, but they were interviewed incompetently. And that didn't lead to obtaining the information that could be followed up on in an investigation.  Yes, you may. Yes, you may. Your funding question, Chief Judge. I think that, you know, after the ISD's decision from the Supreme Court, Martinez, Triviano, this court's opinion in Juniper, you definitely have to look at that statute differently. And the case that the district court relied on, Wright. Wright case, yeah. I mean, I don't criticize it for when it was decided at the time, but a key component of that case was the inability to expand the record that we now have with Martinez. And I think your honor makes a good point that you don't really know what's going to happen until you investigate it. And I know things are changing because we have a capital habeas unit being formed now in the Fourth Circuit. But at the time, when you're trying to put a budget together for how you're going to handle one of these cases, at that point, even the lawyers, even though you're informed by your review of the case, you don't know where things are going to lead until you start doing the investigation. And that's what happened here. And that's why we made our motion for that type of funding at the stage that we did. Right. And that alone, in terms of the standard, not the incorrect standard for the funding, would excuse in terms of the Martinez and those, because that's not right there, because then you have to go and find out what, if that's correct, what's available. And that would excuse the default of the Martinez aspect and other IAC claims, which include the lay witness and all those other things. So that becomes an important aspect of it, getting that wrong. It's a matter of law. And I think that our supplemental information that we provided to the district court is, you know, a proffer of a separate claim that we would have been able to raise if the funding panned out and the expert was able to provide useful testimony. Absolutely. All right. Thank you so much, Mr. Gross. I noted that you're caught upon it. I just want to take, to express specifically our appreciation. Our court could not function without lawyers like yourselves to take on these cases. We appreciate that. And Ms. Brown, we note your able representation of the state and precision and both counselors, a fine job representing their positions here today. Wish we could come down and shake your hands. We cannot, but no, nonetheless that we very much appreciate your being here. We hope that you will be safe and stay well. Take care of council. Thank you, your honor.
judges: Roger L. Gregory, G. Steven Agee, Julius N. Richardson